ORIGINAL

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

FILED

MAY 25 2010

CLERK, U.S. DISTRICT COURT
By_____
          Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

PATRICIA TUSKEN,                      §
          PLAINTIFF,                  §
                                      §
VS.                                   §    CIVIL ACTION NO. 4:08-CV-657-A
                                      §
MICHAEL J. ASTRUE,                    §
COMMISSIONER OF SOCIAL SECURITY,      §
          DEFENDANT.                  §

FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE
AND
NOTICE AND ORDER

This case was referred to the United States Magistrate Judge pursuant to the provisions of

Title 28, United States Code, Section 636(b). The Findings, Conclusions and Recommendation of

the United States Magistrate Judge are as follows:

FINDINGS AND CONCLUSIONS

I. STATEMENT OF THE CASE

The plaintiff, Patricia Tusken ("Tusken") filed an application for disability insurance benefits

and supplemental security income on June 23, 2003. (Transcript ("Tr.") 64.) Tusken alleged that

she was unable to engage in substantial gainful activity from June 9, 2003 through the date of the

hearing. (Tr. 64.) She claims that she is disabled as a result of a number of impairments. Tusken's

alleged physical impairments include multiple ruptured disks, nerve damage in her left leg, swelling,

pain, and numbness. (Tr. 64, 119-21, 159; Plaintiff's Brief ("Pl. Br.") at 3.) Her alleged mental

impairments include depression and anxiety, including panic attacks which occasionally require

hospital care. (Tr. 64, 119-21, 159; Pl. Br. at 3.) Tusken's application and motion for rehearing were denied, and, after a hearing before administrative law judge ("ALJ") William Helsper on May 4, 2005, the ALJ found that Tusken was not disabled. (Tr. 64, 547-69.) The Appeals Council initially denied Tusken's request for review, but vacated it's denial order to consider new information received on May 24, 2006. (Tr. 6-8, 28-31.) After considering the new information, the Appeals Council again denied Tusken's request for review. (Tr. 54-57.) Tusken subsequently filed the instant action in federal court on November 3, 2008. (doc. #1.)

## II. STANDARD OF REVIEW

The Social Security Act defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. § 423(d), 1382c(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). To determine whether a claimant is disabled, and thus entitled to benefits, a five-step analysis is employed. 20 C.F.R. §§ 404.1520, 416.920. First, the claimant must not be presently engaging in substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. §§ 404.1527, 416.972. Second, the claimant must have an impairment or combination of impairments that is severe. An impairment or combination of impairments is not severe if it has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work. 20 C.F.R. §§ 404.1520(c), 416.920(c); *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000). At the third step, disability will be found if the impairment or combination of impairments meets or equals an impairment listed in the appendix to the

regulations. 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if disability cannot be found on the basis of the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* §§ 404.1520(e), 416.920(e). And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* §§ 404.1520(f), 416.920(f); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir.1999).

At steps one through four, the burden of proof rests upon the claimant to show he is disabled. If the claimant satisfies this responsibility, the burden shifts to the Commissioner at step five of the process to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Crowley,* 197 F.3d at 198. If the Commissioner meets this burden, the claimant must then prove that he cannot in fact perform the work suggested. *Waters v. Barnhart,* 276 F.3d 716, 718 (5th Cir. 2002). A denial of benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater,* 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen,* 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel,* 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* This court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's. *Harris v. Apfel,* 209 F.3d 413, 417 (5th Cir. 2000). The Court must, however, carefully scrutinize the record to determine if the evidence is present.

### III. ISSUES

1.  Whether the ALJ applied the appropriate legal standard at step two regarding Tusken's severe impairments;

2.  Whether the ALJ's finding that Tusken's mental impairments are "non-severe" is supported by substantial evidence;[1]

3.  Whether the ALJ applied the appropriate legal standard in determining Tusken's residual functioning capacity ("RFC");

### IV. ADMINISTRATIVE RECORD

A.   Treatment History

On June 9, 2003, Tusken went to Tarrant County Hospital District ("TCHD") complaining of swelling in her legs. (Tr. 229.) She said she had elevated her legs over the previous night but then worked all day, and the condition had not improved. (Tr. 229.) She was diagnosed with swelling in her lower legs and discharged with instructions to elevate her legs, wear support stockings, and avoid standing for long periods of time. (Tr. 229-30.) One week later, on June 16, 2003, Tusken went back to TCHD complaining of heart palpitations and back pain going down into her legs. (Tr. 227.) The physician who examined Tusken placed her on pain medication, noting that the swelling improved when her legs were elevated. (Tr. 227.)

About a month later, on August 17, 2003, Tusken underwent a consultative mental status examination by Dr. Donna Goodrich ("Goodrich"), a licensed psychologist chosen by the Agency to evaluate Tusken. (Tr. 265.) At the appointment, Tusken reported that she was currently taking a number of medications, including Zoloft, Estrogen, Flexeril, Clonazepam, Hydrocodone and

---

[1] Tusken also claims that the ALJ failed to weigh the medical opinions of the state agency physicians in accordance with the law. (Pl. Br. at 22-25.) This issue is subsumed within the Court's analysis of whether the ALJ's finding that Tusken's mental impairments are "non-severe" is supported by substantial evidence.

Neurontin. (Tr. 266.) Goodrich noted that Tusken drove herself to the session from five miles away, that her ambulation and posture appeared awkward, and that she utilized a cane. (Tr. 265.) Goodwin also reported that Tusken was clean and well-groomed. (Tr. 265.) Goodrich judged that Tusken was a fairly reliable informant, and she noted that the information given to her by Tusken was confirmed by the Texas Rehabilitation Commission ("TRC") records. (Tr. 265.) Goodrich noted that Tusken appeared "anxious and depressed," "easily overwhelmed and confused," and that her current intelligence appeared below average. (Tr. 268.)

Ultimately, Goodrich diagnosed Tusken with Dementia NOS, Provisional, noting a possible head injury and Tusken's family history of early onset Alzheimer's, Major Depressive Disorder ("MDD"), recurrent with Psychotic Features, and Panic Disorder Without Agoraphobia by report. (Tr. 268.) Goodrich concluded that Tusken's abstract thinking was inadequate, and that she was unable to do similarities at an age-appropriate level. (Tr. 266.) Goodrich found that Tusken possessed adequate insight, but inadequate judgment. (Tr. 268.) Goodrich assigned Tusken a global assessment of functioning ("GAF") score of "45 – Unable to function outside the home."[2] (Tr. 269.) Goodrich listed her prognosis of Tusken's condition as "very guarded," observing that Tusken exhibited multiple symptoms of depression and anxiety, that she had possible dementia, could not handle stress, and had health problems. (Tr. 269.) Goodrich recommended that Tusken should have intensive counseling as well as continued psychotropic medication monitoring to find appropriate ones that might lead to improvement in Tusken's functioning. (Tr. 269.)

---

[2]   The American Psychiatric Association defines an individual whose GAF is between 41 and 50 as one who has "Serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable TO KEEP A JOB)." American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (4th Ed., 2000) at 34.

The next day, on August 18, 2003, Dr. Raymond R. Westbrook ("Westbrook"), examined Tusken at Arlington Medical Clinic. (Tr. 271-73.) He noted that Tusken reported smoking half a pack of cigarettes per day for the past seven years and that she was five feet, five inches tall and weighed 205 pounds. (Tr. 277-72.) He determined that Tusken had spondylolysis and a history of hepatitis with normal liver functioning. (Tr. 273.)

On August 30, 2003, Tusken went to TCHD for a follow-up appointment for her lower back pain, and she was examined by Dr. Rodrigo Anzola ("Anzola"). (Tr. 222.) Anzola prescribed continued pain medication and raised Tusken's dosage of Zoloft. (*Id.*)

The following month, on September 22, 2003, Stephanie Judis, a psychiatrist, reviewed the evidence in Tusken's medical record and completed a psychiatric review technique form. (Tr. 280-93.) She found that Tusken had MDD recurrent, as well as panic disorder without agoraphobia. (Tr. 280, 283, 285.) Additionally, she found that Tusken was mildly restricted in the activities of daily living, that she had mild difficulty maintaining social functioning, that she had moderate difficulty in maintaining concentration, persistence and or pace, and that she had not had episodes of decompensation. (Tr. 290.)

Later that year, Tusken arrived at the JPS Health Network ("JPS") emergency department on December 26, 2003 using crutches and reported an injury to her left foot resulting from a fall the previous day. (Tr. 348, 350.) She was diagnosed with a fracture of the left fifth metatarsal base and placed in a posterior splint and discharged with orders to return for a follow up in three weeks. (Tr. 352.)

On January 13, 2004, Tusken went back to the JPS emergency department reporting sudden-onset palpitations in her chest, shortness of breath and a headache. (Tr. 343.) The reviewing physician diagnosed Tusken with paroxysmal supraventricular tachycardia ("PSVT"), treated her with an IV medication, and later discharged her. (Tr. 344.)

A week later, on January 20, 2004, an x-ray image was taken of Tusken's left foot at JPS, and Dr. Richard Gasser noted that the fracture base of the left fifth metatarsal was in good position. (Tr. 342.) But after Tusken returned for a follow up x-ray on February 10, 2004, Dr. Kenneth Cox determined that the fracture was incompletely healed. (Tr. 341.) Tusken went back to JPS for another x-ray on March 16, 2004, ambulating in a CAM walker and cane, and Dr. Travis Motley ("Motley"), a podiatrist, found that the fracture was slowly healing, but continuing to progress. (Tr. 212-13.) Motley ordered Tusken to continue wearing the CAM boot and using a cane for two additional weeks and then to gradually wean herself from the boot and cane and return to normal shoe gear. (*Id.*) Tusken was to return for a follow-up in three months. (*Id.*)

Tusken underwent back surgery on April 19, 2004, and Dr. John Malonis, performed an L5, S1 posterior instrumentation with laminectomy, discectomy and fusion. (Tr. 303, 312.) Tusken was discharged on April 23, 2004, and the discharging physician noted that she was able to ambulate well with physical therapy. (Tr. 303.)

Tusken again reported to the JPS emergency room on May 11, 2004 complaining of heart palpitations during her sleep, and she was again diagnosed with PSVT and treated with medication. (Tr. 206-07.)

On July 27, 2004 Tusken went to the TCHD emergency department and told the medical personnel that she had suffered a fall at home that day when her legs gave way as she was washing dishes. (Tr. 380.) She said she was experiencing numbness in her right leg below the knee, severe pain on left leg behind the knee and around the ankle, and pain in her back. (Tr. 376-382.) The examining physician noted Tusken's history of PSVT, hypertension, and anxiety and noted that she appeared anxious and moderately distressed. (Tr. 380.) Tusken underwent a magnetic resonance imaging scan ("MRI") that day, and reviewing physician Dr. Bing Obaldo found that she had mild-to-moderate lumbar spondylosis, but no acute fracture or dislocation and minimal residual anterolisthesis of L5 over S1, despite the presence of bilateral Luque plates that appeared to be in good position. (Tr. 374.) TCHD doctors determined that Tusken's fall had likely exacerbated her pre-surgery pathology and noted that her symptoms were similar to those she experienced prior to surgery. (Tr. 375-76.) Tusken was diagnosed with lower back pain with a neurological deficit and told to follow up with Dr. Zachary Kelley ("Kelley"), an orthopedist. (Tr. 375-76.)

At her follow up appointment on August 4, 2004, Tusken underwent another MRI which showed evidence of mild spondylolisthesis and Kelley noted that Tusken's wound from her surgery in April had become infected but had healed. (Tr. 370-71.) Kelley found that Tusken was ambulatory with a walker and brace, and he noted that she was being treated with anti-inflammatory medication. (Tr. 371.) He also noted that Tusken had slight weakness in her lower left extremity and reduced sensation in her left leg. (*Id.*)

Tusken returned to TCHD on November 10, 2004, received refills of her medications, and was again encouraged to quit smoking by the medical personnel at TCHD. (Tr. 361.)

-8-

Tusken underwent another MRI on March 28, 2005, and it revealed that she had no compression fractures, but she was suffering from mild discogenic spondylosis and mild upper left convexed scoliosis without rotary component centered at C6-7. (Tr. 418.)

On April 4, 2005, Tusken went to the TCHD JPS Behavioral Health Clinic after being referred to the Department of Psychiatry there by Dr. Fidel Ogata ("Ogata"), who had previously been dispensing Tusken's psychotropic medications. (Tr. 539.) The attending psychiatrist there listed diagnoses of Depression NOI and chronic back pain, and prescribed Zoloft, Lexapro and Elavil. (Tr. 545.) Tusken returned on May 2, 2005, just prior to her hearing before the ALJ, for a follow up appointment and was prescribed Lexapro and Klonopin (clonazepam). (Tr. 526-31.)

B.    Administrative Hearing

At her hearing before the ALJ, Tusken testified that she was 50 years old and had completed two years of college. (Tr. 550.) She testified that she was most recently employed as a hairstylist in August 2003, but she was forced to stop working as a result injuries she suffered from a fall down cement steps. (Tr. 550-51.) Describing her daily activities to the ALJ, Tusken stated that she laid in bed during the day watching television, reading, and looking out the window. (Tr. 552.) She said that a friend would visit her during the lunch hour to make sure Tusken had something to eat and to help Tusken with grooming. (Tr. 552.) Tusken said that she usually had a pretty good appetite and that she had gained quite a bit of weight since she stopped working. (Tr. 552-53.) Tusken testified that she was being treated by a psychiatrist for depression, and that she went to counseling once a month, when her physician also continued or adjusted her prescriptions for psychotropic medication. (Tr. 554-55; 561.) When asked whether her pain medication seemed to help any, she answered yes,

-9-

but said that the nerve damage in her back bothered her badly. (Tr. 555.) Tusken also testified that

she wore a back brace at all times unless she was sleeping. (Tr. 555-56.) Additionally, she testified

that she was wearing a "Boston soft jacket" prescribed to her by a doctor after she underwent back

surgery on April 19, 2004. (Tr. 557.) Tusken testified that she was likewise ordered to wear a "Cam

boot" by her physician on December 25, 2003, that she could never get around without it, and that

she was unable to use a cane. (Tr. 557-58.)

Vocational expert ("VE") Donna Humphries also testified at Tusken's hearing. The ALJ

asked the VE to consider a hypothetical claimant with the same age, education and work experience

as Tusken and an RFC for sedentary work, with no mention of any limiting mental impairments. (Tr.

565.) As to whether there would be any work existing in the national economy that such an

individual could perform, the VE responded that there would be approximately 10,000 receptionist

positions, a sedentary and semi-skilled occupation, in Texas, and approximately 200,000 in the

national economy. (Tr. 566.) She also stated that there would be information clerk positions, also

sedentary and semi-skilled, with approximately 3,000 to 5,000 jobs existing in Texas and 50,000 in

the national economy. (Tr. 566.) When asked by Tusken's attorney if her conclusion would remain

the same if the hypothetical claimant had to elevate their legs every 40 minutes for an hour and a half

as Tusken testified she was told by her doctor to do, the VE admitted that the jobs she described

would not allow such limitation. (Tr. 564; 567.) The VE also testified that both jobs would require

the hypothetical individual to "stay on task and be able to concentrate on the conversation" while

greeting, meeting the public, and giving out information. (Tr. 567.)

C.    The ALJ's Decision

In entering his decision, the ALJ went through the five-step sequential evaluation process for

determining whether a person is disabled.  (Tr. 64-73); 20 C.F.R. § 416.920(b).  At step one, the ALJ

found that Tusken met the disability insured status requirements of the Act from June 9, 2003

through the date of the decision.  (Tr. 65, citing 20 C.F.R. § 404.101, *et seq*.)  He further found that

Tusken had not engaged in substantial gainful activity from her alleged onset date of June 9, 2003

through the date of the decision.  (Tr. 65, citing 20 C.F.R. §§ 405.1510, 404.1572 and 416.910,

416.972.)

At step two, the ALJ determined that Tusken had no severe mental impairments, but found

that she had several severe physical impairments, including:

> obesity with chronic back complaints, with mild anterior spondylolisthesis, status
> post L5-S1 fusion, spondylosis of the cervical spine [at] C5-7, and nicotine abuse.

(Tr. 65-67.)

In his analysis of Tusken's mental impairments, the ALJ noted that the record showed that

she had a history of treatment for anxiety, accompanied by intermittent episodes of tachycardia, non-

ischemic, and depression.  (Tr. 66.)  The ALJ found that the record demonstrated that Tusken's

anxiety and depression were well-controlled on medication provided by her family physician without

referral for further evaluation or psychiatric treatment.  (Tr. 66.)  He also discussed the evaluation

of Tusken by Goodrich.  (Tr. 66-67.)  The ALJ acknowledged that Goodrich diagnosed Tusken with

dementia NOS (provisionally), MDD, with psychotic features, panic disorder without agoraphobia,

with a GAF of 45/50, with inability to function appropriately outside the home.  (Tr. 67.)  The ALJ

-11-

determined, however, based on his reading of the record, that because Goodrich's evaluation appeared to reflect Tusken's subjective allegations and that Goodrich's conclusions were not corroborated in the remainder of the record, he would not to give it significant weight. (Tr. 67.) The ALJ summarily concluded as follows:

> There is, therefore, no *objective evidence* that [Tusken] has a mental impairment that imposes *more than* [a] minimal limitation on her residual functioning capacity for work activity, and I have concluded that she thus does not have a severe mental impairment. *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985.)

(Tr. 66) (emphasis added)[3]

The ALJ continued to step three, finding that Tusken's severe impairments did not meet or equal a listing at step three of the disability analysis. (Tr. 65, 67, citing 20 C.F.R. Part 404, Subpart P, Appendix 1); *see also* 20 C.F.R. 404.1525-26. The ALJ also determined that Tusken's subjective complaints were not fully credible. (Tr. 68-70.)

In his analysis of Tusken's credibility, the ALJ concluded, without citing to any specific evidence in the record, that Tusken's allegations of debilitating mental symptoms were inconsistent with and refuted by the actual treatment records. (Tr. 68.) He determined that, based on his review of the medical records, there were no objective medical findings or clinical signs substantiating Tusken's claim of depression. (*Id.*) Instead, the ALJ found that the record showed that Tusken's intermittent anxiety and depression were well-controlled on medication. (*Id.*)

The ALJ also found that Tusken's ability to compose and submit a number of lengthy, articulate documents during her disability application process was evidence of her lack of credibility

---

[3] The ALJ also cited to 20 C.F.R. § 404.1524(c) which was repealed years ago.

regarding her mental impairments. (Tr. 70.) He further noted that her electronically generated earnings record reflected that she worked until June 2003 rather than July 2002, the date she reported to the consultative examiner. (*Id.*) The ALJ also determined that Tusken's choice to continue smoking against medical advice made her less credible. (*Id.*) And he commented on Tusken's appearance, including piercings and tatoos as evidence that her claims of significant financial constraints were not credible. (Tr. 69.) Finally, he stated that Tusken could live independently and take care of her own personal grooming needs and light housekeeping. (*Id.*) Ultimately, the ALJ found that, "considering the record as a whole," Tusken's allegations of disability were inconsistent with the medical evidence, treatment record, and Tusken's own report of her daily activities. (Tr. 70.)

The ALJ then formulated a RFC for Tusken, finding that she could perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a). (*Id.*) He specifically found that Tusken had "no severe nonexertional limitations." (*Id.*) According to the C.F.R., "sedentary" job has the following characteristics:

> involves lifting no more 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567(a); 416.967(a).

After determining Tusken's RFC, the ALJ proceeded to step four of the analysis and found that Tusken was unable to perform her past relevant work as a hairstylist. (Tr. 71.) Then in step five the ALJ considered the VE's testimony as well as Tusken's exertional capacity for sedentary work,

her age, education and past work experience and RFC, and he determined that Tusken was not disabled under the meaning of the Social Security Act as she could perform sedentary work, such as a receptionist, with approximately 10,000 jobs in the state economy and 200,000 jobs in the national economy or as an information clerk, with approximately 3,000 jobs in the state economy and 50,000 jobs in the national economy. (Tr. 72, 566.) Ultimately, the ALJ concluded that Tusken was not disabled within the meaning of the Act at any time from the alleged date of onset through the date of the decision. (Tr. 72-73.)

## V.  DISCUSSION

A.      Whether the ALJ applied the appropriate legal standard at step two regarding Tusken's severe impairments.

The first issue before the Court is whether the ALJ applied the appropriate standard for severity at step two regarding Tusken's severe impairments. (Pl. Br. at 5-10.) In his analysis of Tusken's impairments, the ALJ cited 20 C.F.R. § 404.1524(c) and *Stone* three times: with regard to his evaluation of Tusken's Hepatitis C, carpel tunnel syndrome, and alleged mental impairment. (Tr. 65-66.) He did not, however, specifically state the standard set forth in *Stone* in his ruling. Moreover, the C.F.R. section the ALJ referred to, 20 C.F.R. § 404.1524(c), was repealed years ago. The current section, roughly analogous to the one cited by the ALJ, is 20 C.F.R. § 404.1520(c). That section states that a severe impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). The Fifth Circuit analyzed that section in *Stone* and mandated that all future ALJ decisions apply the construction of section 1520(c) set forth in that opinion. 752 F.2d at 1106.

-14-

The Commissioner has issued regulations that define a severe impairment as one which significantly limits a claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c). *See also* 20 C.F.R. §§ 404.1521(a), 416.921(a). The Fifth Circuit, however, has found that a literal application of that definition is inconsistent with the statutory language and legislative history of the Social Security Act. *Stone*, 752 F.2d at 1104-05. Instead, the Fifth Circuit has established the following standard for determining whether a claimant's impairment is severe: An impairment is not severe only if it is "a slight abnormality having *such minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." *Stone*, 752 F.2d at 1101 (emphasis added). The *Stone* severity standard does not allow for *any* interference with work ability. *Scroggins v. Astrue*, 598 F. Supp. 2d 800, 805 (N.D. Tex. 2009) ("*Stone* provides no allowance for a minimal interference on a claimant's ability to work."). An ALJ's failure to apply the *Stone* standard is a legal error, not a procedural error and the claim must be remanded to the Secretary for reconsideration unless the correct standard is used. *Stone*, 752 F.2d at 1106.

In this case, although the ALJ referred to *Stone* by name, it is not clear that he applied the appropriate standard. The Court must therefore look beyond the "magic words" and read the opinion of the ALJ carefully to ensure he used the appropriate "slight impairment" standard in determining that Tusken's mental impairment was not severe. *Hampton v. Bowen*, 785 F.2d 1308, 1311 (5th. Cir. 1986).

The ALJ employed a standard requiring that an impairment have "more than [a] minimal effect" on Tusken's ability to work in order to be considered severe. The United States District

Court for the Northern District of Texas has repeatedly held that the standard applied in this case, as evidenced by the ALJ's language in his ruling, does not comply with the standard set forth in *Stone*. *See, e.g.*, *Stone*, 752 F.2d at 1106; *Ruby v. Astrue*, 2009 WL 4858060 at *7-8 (N.D. Tex Dec. 14, 2009); *Sanders v. Astrue*, 2008 WL 4211146 at *7 (N.D. Tex. Sept. 12, 2008); *Scroggins v. Astrue*, 2009 WL 192875, at *5 (N.D. Tex. Jan. 27, 2009). Although the ALJ's in those cases failed to cite to *Stone* by name, unlike the ALJ in the present case, each of those cases reviewed decisions in which an ALJ used identical or nearly identical language at step two, and in each case the Court held that the ALJ failed to apply the *Stone* standard by requiring "more than a minimal" effect on an individual's ability to work. *See id.* But *Stone* does not allow even a minimal interference on a claimant's ability to work. *Id.*

In the present case, the ALJ's application of the regulations did not expressly state the *Stone* standard or another opinion of the same effect. Nor did the ALJ indicate that he employed the *Stone* definition of severity. The failure of the ALJ to apply the correct standard to the severity requirement as set forth in *Stone* and his failure to apply *Stone*'s construction of 20 C.F.R. § 404.1520(c) requires that this case be remanded for reconsideration. *Stone*, 752 F.2d 1099. Moreover, as discussed, *infra,* in section B, the evidence in the record does not make it clear that the outcome would remain the same if the correct standard were applied. Given the low bar for the establishment of a severe impairment under *Stone*, ordinarily remand would be appropriate to allow the Commissioner to clarify that the *Stone* opinion was followed and to revisit whether any other of Tusken's impairments should have been included among Tusken's severe impairments at step two of the ALJ's analysis. As the Court explains in the following section, however, the ALJ's finding

at step two regarding Tusken's mental impairments is not supported by substantial evidence and must therefore be overturned.

      B.    <u>Whether the ALJ's finding that Tusken's mental impairments are "non-severe" is supported by substantial evidence.</u>

Tusken next argues that the ALJ's finding that her mental impairments are "non-severe" is not supported by substantial evidence in the record as a whole. (Pl. Br. 10.) As stated previously, the Court may only make a finding of no substantial evidence if no credible evidentiary choices or medical findings support the decision. *Boyd*, 239 F.3d at 704.

In his analysis of Tusken's mental impairments, the ALJ stated that he had reviewed the consultative psychological evaluation of Tusken administered by Goodrich, a psychologist, in August of 2003. (Tr. 66.) Notably, Goodrich was chosen by and paid for by the Agency to evaluate Tusken's mental condition. (Plaintiff's Reply Brief ("Pl. Rep. Br.") at 1; Tr. 560.) The record establishes that Tusken had been taking both antidepressant and anti-anxiety medications prior to her evaluation, and that she reported that fact to Goodrich. (Pl. Br. at 11; Pl. Rep. Br. at 1-2; Tr. 265-66.) As discussed previously in Tusken's medical history, Goodrich diagnosed Tusken with dementia NOS (on a provisional basis), MDD with psychotic features, panic disorder without agoraphobia (by subjective support), with a GAF of 45/50 and inability to function appropriately outside the home. (Tr. 268-69.) Goodrich also noted that the information Tusken provided her was confirmed by the TRC records. (Tr. 265.) But the ALJ chose to give little weight to Goodrich's assessment, because in his opinion it appeared to reflect only Tusken's subjective allegations, which he said were not corroborated in the record. (Tr. 66.)

While an ALJ may choose to give one expert's opinion more weight than another, in this instance the ALJ failed to point to any medical evidence contradicting Goodrich's assessment. (Tr. 66.) He simply noted that in a questionnaire Tusken completed on December 3, 2003, she had marked "no" to questions regarding whether she had limiting mental or emotional problems and whether she had received treatment for mental or emotional problems. (Tr. 67.) In Tusken's brief, she points out that the ALJ did not look at those responses in the context of the three page handwritten document Tusken submitted along with the questionnaire that day, in which she argued her subjective belief, as a lay person, that her problems were all as a result of physical sickness, not mental illness, going so far as blaming her treatment for panic attacks on a heart condition rather than anxiety. (Pl. Br. at 17; Tr. 142-44.) It is unclear whether the ALJ ever looked at Tusken's concurrent submission because he did not mention it, nor did he question Tusken about the questionnaire at the hearing, thus failing to develop the facts fully and fairly as required by the law. *See, e.g.*, *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000) (holding that an ALJ's decision is not substantially justified if he does not satisfy his duty to fully and fairly develop the facts); *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995) (finding that the ALJ failed to develop the record fully when he concluded that the claimant was capable of performing sedentary work, even though there was no medical testimony supporting this conclusion).

In addition to choosing to give little weight to Goodrich's evaluation, the ALJ made no mention whatsoever in his mental impairment assessment of the evaluations performed by two State Agency physicians, who both concluded that although Tusken's mental impairments did not satisfy a listing, they were severe. (Tr. 280; Pl. Br. 11, Exh. B.) The State Agency physicians diagnosed

Tusken with MDD recurrent, as well as panic disorder with agoraphobia. (*Id.*) Additionally, they determined that Tusken had "moderate" difficulties in maintaining concentration, persistence or pace, but the ALJ determined, without citation to any medical evidence to the contrary, that her difficulties were "mild." (Tr. 290; Pl. Br., Exh. B.) The ALJ also failed to discuss the detailed Mental RFC Assessment completed by the State Agency physicians, in which the physicians noted that Tusken was "markedly limited" in her abilities to understand, remember, and carry out detailed instructions and "moderately limited" in numerous areas. (Tr. 277.) None of these conclusions were acknowledged in the ALJ's mental impairment assessment. In fact, the only time the ALJ acknowledged the existence of the opinions of the State Agency medical consultants was a citation to support his determination that Tusken's impairments did not meet or equal the requirements of section 1.04 or the requirements of any of the Listings of Impairments. (Tr. 67.) Finally, the ALJ made no mention of the ER records from Tusken's treatment for panic attacks, which also included physical examinations. (*See, e.g.*, Tr. 334.) The law is clear that while opinions on the ultimate issue of disability status under the regulations are reserved to the ALJ, he must consider all medical opinions, which the ALJ in this case failed to do. 20 C.F.R. § 404.1527(b),(e)(1), 416.927(b), (e)(1); *Estrada v. Barnhart*, 2006 WL 1347970, at *7 (May 12, 2006). Mental health professionals must have specialized training in order to evaluate mental functioning, including depression. *Gonzalez v. Barnhart*, 2006 WL 1875912 (W.D. Tex. June 30, 2006). An ALJ who discounts the diagnoses and opinions of specialists in the field without providing specific, legitimate reasons for doing so has "impermissibly substitut[ed] a layman's view of a disorder in lieu of an expert opinion." *Id.* That is precisely what has occurred in this case.

The record also reveals factual inconsistencies in the ALJ's conclusions regarding Tusken's mental impairments. For instance, the ALJ noted that the drugs Tusken took for her psychiatric impairments were prescribed "by her family physician, without referral for further evaluation or psychiatric treatment" (Tr. 66), but the record showed that Tusken initially received the prescriptions from Dr. Ogata at JPS, who then referred her to a psychiatrist with whom she was receiving monthly counseling sessions at the time of the hearing. (Tr. 553-54.).

Finally, an ALJ must consider the entire case record in determining the credibility of an individual's own statements about her symptoms and how they affect her, along with any other relevant evidence in the record. *See* Social Security Regulation 96-7p. He may not simply disregard her statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on her ability to work solely because they are not substantiated by *objective* medical evidence. *Id.* The ALJ in this case admittedly confined his step two inquiry to the "objective evidence." (Tr. 67.) This included dismissing the diagnoses given by Goodrich, a licensed psychologist, as well as the opinions of two State Agency physicians. (Tr. 67.)

It is unclear whether the ALJ gave any weight to Tusken's subjective complaints and statements about her mental impairments. (Tr. 67). In performing a credibility analysis of Tusken, the ALJ stated that there were "no objective medical findings or clinical signs" substantiating Tusken's symptoms and that, to the contrary, her symptoms were well-controlled on medication, without discussing Goodrich's assessment of Tusken, which took place while Tusken was on medication. (Tr. 68.) He also reasoned that Tusken's ability to compose articulate documents during her disability application process belied her claims of mental impairment. (Tr. 69.) But the ALJ

-20-

failed to explain how anxiety and depression would prevent someone from drafting such documents, and there is no evidence in the record to support such a conclusion. (Tr. 69.) Further, the ALJ noted Tusken's choice to continue smoking despite medical advice as well as her appearance, including facial piercings, and tattoos as reflecting on her credibility. (*Id.*) The claimant's appearance to a layman, however, may not be given more weight than the result of a mental health expert's objective evaluation and her explanation of that evaluation. *Green v. Shalala*, 852 F. Supp. 558, 568 (N.D. Tex. 1994).

A Court may only overturn an ALJ's determinations "where there is a conspicuous absence of credible choices or no contrary medical evidence." *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988) (internal quotation marks omitted); *see also Mims v. Astrue*, ___F. Supp.2d___2010 WL 1170010, at *14 (S. D. Tex. March 23, 2010) (finding that the ALJ's decision not to include claimant's allegations of mental impairments at step two was unsupported by substantial evidence). After reviewing the complete record in this case, the Court finds that the ALJ's decision at step two was not supported by substantial evidence. The record reveals "a conspicuous absence of credible choices." *See Johnson*, 864 F.2d at 343-44. The Court thus overturns the ALJ's decision at step two and finds that Tusken's mental impairment meets the legal standard for a severe impairment. This finding will necessarily require the ALJ to reformulate Tusken's RFC to include her severe mental impairment. Nevertheless, the Court will address Tusken's remaining issue on appeal.

C. Whether the ALJ applied the appropriate legal standard in formulating Tusken's RFC.

The ALJ stated the following in formulating Tusken's RFC: "The claimant retains the functional capacity to perform the physical exertional requirements of sedentary work activity. There

are no severe nonexertional limitations." (Tr. 70, citing 20 C.F.R. §§ 404.1545 and 416.945; Social

Security Regulation 96.7p.) Although the ALJ specifically found that Tusken had mild difficulty

in maintaining social functioning and in maintaining concentration, persistence, or pace (Tr. 67), he

did not include any mental limitation in either the RFC he formulated or in the hypothetical he

presented to the VE.

     In her appeal, Tusken claims that the ALJ inappropriately excluded the mild mental

limitations he found Tusken to have when assessing her RFC, in violation of 20 C.F.R. §

404.1545(e), which requires consideration of the limiting effects of all impairments, even those that

are not severe, in determining a claimant's RFC. (Pl. Br. at 20-22; Pl. Rep. Br. at 4-5.) An ALJ

assessing a claimant's RFC must consider all limitations and restrictions imposed by all of a

claimant's impairments, including those that are not found to be "severe." *See* Social Security

Regulation 96-8. This is because even non-severe limitations may combine with other severe

impairments to prevent an individual from doing past relevant work or may narrow the range of work

that the individual can perform. *Id.* For this reason alone, the ALJ's decision must be reversed,

because he assessed Tusken's RFC using an inappropriate legal standard.

     Additionally, the Fifth Circuit has made it clear that the hypothetical question posed by the

ALJ to the VE must encompass all of the disabilities of the claimant recognized by the ALJ.

*Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994). Without such inclusion, the determination of

non-disability based on the hypothetical cannot stand. *Id.* The ALJ in this case determined that

Tusken had "mild" limitations in both social functioning and in "concentration, persistence, and

pace," but he failed to include any such limitation in the RFC he formulated or in the hypothetical

posed to the VE.  (Tr. 67.)  The hypothetical was thus  improper, and the ALJ could not rely on the

VE's opinion as substantial evidence.  *See Bowling*, 36 F.3d at 436-38.  As was the case in *Bowling*,

the ALJ's "defective handling of the hypothetical question to the [VE] produced reversible error,"

and another basis for reversal and remand of this case.[4]  *Id.* at 438.

RECOMMENDATION

It is recommended that the Commissioner's decision be reversed and remanded for further

administrative proceedings consistent with these proposed findings of fact and conclusions of law.

NOTICE OF RIGHT TO OBJECT TO PROPOSED

FINDINGS, CONCLUSIONS AND RECOMMENDATION

AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific

written objections in the United States District Court to the United States Magistrate Judge's

proposed findings, conclusions and recommendation within fourteen (14) days after the party has

been served with a copy of this document.  The court is hereby extending the deadline within which

to file specific written objections to the United States Magistrate Judge's proposed findings,

conclusions and recommendation until June 15, 2010.  The United States District Judge need only

---

[4] In addition to asking the Court to remand this Case, Tusken requests that the Court recommend that the Agency assign her claim to a different ALJ, so that she can have an ALJ "who can focus on the facts deemed relevant by law, rather than her personal appearance, facial piercings, and tattoos." (Pl. Br. at 25.)  The bar for making a finding for judicial bias is a high one.  "[J]udicial remarks...that are disapproving of, or even hostile to counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge unless they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Brown v. Apfel*, 192 F.3d 492, 501 (5th Cir. 1999) (citing *Liteky v. U.S.*, 510 U.S. 540, 555 (1994) (internal quotations omitted)).  Here, although the Court agrees that the ALJ's decision was not supported by substantial evidence, the record does not demonstrate that he did so deliberately or "with such antagonism that he would be unable to follow the court's directions upon remand." *Mims*, ___F. Supp.2d___, 2010 WL 1170010, at *16.  The Court therefore will not order that another ALJ be assigned to Tusken's case upon remand.

make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)(en banc).

<u>ORDER</u>

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until June 15, 2010 to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation.  It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SO ORDERED.

SIGNED May 25, 2010.

JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE

-24-